Thank you, your honors. I'm Larry King for Dr. Pena. Esteemed counsel, Dr. Pena, I feel compelled to comment on the Garcetti case since it is currently before the U.S. Supreme Court and has before it the issue of what is protected speech. All I need to say about the difference between that case and this is in this case there's no question that the proper authority's attention were serious concerns about patient abuse and patients being subjected to gross medical negligence. Well, there may be some concern about that particular issue, but isn't the real issue here whether or not there's a genuine factual dispute over pretext? Yes, your honor, and I'd be happy to go right to that. As this Court set forth in the Kaiser case and many cases since, there's three ways for which a plaintiff in a First Amendment case to demonstrate that the alleged non-retaliatory motives or reasons for his termination are in fact a pretext for the retaliation. The first, which the district court below did not discuss at all, was showing evidence of express opposition to the protected activity. Within the record before you, there is evidence of a meeting right after Dr. Bjorndal came on board as medical director, which occurred after she was in a meeting of the executive committee, which included Mr. Meeker and Ms. Reese, both of whom were named defendants in the then pending case by Dr. Pena about retaliation for his protected speech, in which Dr. Bjorndal described there was a big to do about the fact that Dr. Pena was taking pictures of patients allegedly without the patient's consent. She discussed this with Mr. Meeker, which Mr. Meeker confirmed in his deposition. Again, a named defendant in that lawsuit. Any evidence, counsel, after Dr. Bjorndal spoke with Dr. Pena as to whether he continued that activity? My understanding from the record was that there was not. There were no recurrences. In this record, there is none, but essentially what happened was she threatened him, this is the policy, that you can't take pictures without their consent, and then we come to what is a genuine fact dispute about what occurred in the meeting next. Dr. Pena describes that he explained to her that there was a separate policy that required the taking of a photograph of the injuries. My question was a narrow one, and that is, is there any evidence that after Dr. Bjorndal talked with Dr. Pena about the photographing of injuries, that Dr. Pena continued to photograph injuries? In this record, that may be addressed at the next hearing. My client's testimony concerning that meeting is that she was attempting to intimidate him from documenting patient injuries, and that was the protected activity, that he was communicating that there were injuries and they needed to be investigated. Apart from the photographs, did he engage in any other kind of activity to document patient industries after that meeting? Yes, Your Honor. In fact, just three weeks before he was put on the administrative leave that led to his termination, he documented what he believed to be gross negligence by one of the doctors, giving a patient who already had a bleeding condition in her brain, a medication that increased the risk of bleeding on the brain, and also a separate medication, one of the counterindications of which is an increased risk of seizure activity. That woman, in fact, did have a seizure that left her in a vegetative state. He wrote Dr. Bjarndal a memo which he presented to her, and she admits that it was presented to her, and that letter is part of this record, in which he informed her of what this incident that left this woman in a vegetative state. Three weeks later is when he is put on administrative leave, at the end of which he is terminated. So you have that protected activity, which we say triggers the retaliation that then went forward. In other words, he had sued about protected activity, came back after a long administrative leave that was the basis for the original suit, and then continued to report what he believed to be patient abuse and patient being subjected to malpractice. Can I just ask you to clarify one thing for me, and maybe this question is more appropriate for the other side, but did – when the doctor looked in the patient file of the deceased decedent, what was the decedent's name here? Elizabeth R. Yeah, Elizabeth R. And he noticed that there had been some activity before the ethics committee, but he didn't know what the – the results of that ethics committee meeting was not reflected in the patient file. Did he have some sort of obligation under the hospital's rules to contact the ethics committee or whoever is in charge to find out what was going on? No, he didn't, Your Honor. And what the facts are in this case is – How about apart from just the rules of the hospital? Does a doctor have any kind of ethical responsibility to – when a patient's condition has been evaluated by an ethics committee of the hospital, to check with that committee to see what has – What the doctor was faced with that day was being called down by the – what the – the doctor was telling her that they believed she was on the verge of dying and that CPR would do her no good and just cause her harm, requesting that he issue a DNR. In order to issue a DNR, what the rules required was that there be two doctors that concurred that that was an appropriate thing to do. So he called the doctor who was her normal weekly unit doctor, and by his testimony and what was confirmed in the investigation is that doctor agreed that a DNR was medically appropriate and agreed to be the second doctor and suggested he call the medical director that he did. Is it clear that the primary doctor agreed to be the second doctor in that determination? That was – Or did – or did Dr. Pena just ask? No, they discussed it and – I mean, did he say, I need – there are two doctors need to agree? Yes, they discussed what the regulation – or not regulation, what the guidelines required, the policy required. They both believed it required two doctors, and Dr. Thacker agreed to be the second doctor. And then Dr. Pena called the medical director to inform her that that's what – that he had written the DNR. Now going back to your question about these meetings, I think it's important to understand two things. One, medicine is not practiced by committee. As Dr. Gathman, the chairman of the Ethics Committee said, in November the prior year when they addressed the issue, they addressed it based on what her condition was at the time, and at that time her renal failure, kidney failure, was not serious or life-threatening, and therefore at that point a DNR would not be appropriate. That's November. January there's the IPP meeting where they review that – they reviewed that decision and decided at that time again that under the circumstances at that time a DNR would not be appropriate. Now there's a lot – then Dr. Pena, months later, is faced with the situation, and as he told Dr. Bjorn Dahl and as he's testified in his deposition, by that time her condition had deteriorated dramatically. She had lost 30 to 40 pounds. She was clearly dying. And as Dr. Gathman, the chairman of the Ethics Committee testified in his deposition, at the end stages of a fatal illness, CPR is not appropriate. As Dr. Bjorn Dahl, the one who made the decision, said, at that point it has no reasonable likelihood of reversing the situation. If the heart stops at that point, it's because the kidneys have failed and giving CPR will not change the kidney failure or revive the heart. What if it's clear from the patient's records that the patient, you know, demonstrated that the patient had chosen – Once. No matter what. I'm glad you asked that question. There's a mechanism under this agency's regulations for making that clear in a record. That's the advance directive. Gathman and Bjorn Dahl and Meeker all talked about that. The process to get an advance directive in the record is you meet with the patient, you be sure they have the information they need to make an informed decision, you make sure that they have the capacity to make the informed decision. If that's their decision, there is then put in their medical records that are available for any doctor who treats her, a notice of that advance directive. There was no advance directive in these records, either at the time that Dr. Pena was reviewing them or has produced in discovery. What they try and say is that she made that decision, but it's not in the IPP before, it's not in the minutes of the Ethics Committee before them. All they talk about is aggressive care, and this agency made the decision not to give her aggressive care. They didn't give her kidney transplant or dialysis, and therefore they made the decision that her kidney failure was going to follow its normal course, which meant in a matter of time she was going to be faced with a situation where even CPR would not help her. And they used that excuse, although all the doctors involved say CPR would have done her no good, as the basis for the termination, which raises the question, why would doctors, even where doctors disagree, you'd say disagreements are normal, but here they all agree CPR would do her no good, and yet they fire him for writing an order that's saying in this immediate circumstance where she's dying, CPR is going to do her no good. Your time is up. Thank you, Your Honor. We'll let you have one minute of rebuttal. I appreciate that.  My name is Terry Sinney. I represent the defendant and appellee, Dr. Judith Bjorndal, in this matter. I think it's important to remind ourselves that what this case involves is a decision by a weekend doctor to take it upon himself to unilaterally reverse a course of action that Sonoma Developmental Center had determined was appropriate for the end-of-life care for this elderly woman who was in extreme decline. That decision was taken over a substantial period of time with the deliberation of interdisciplinary committees, including the Bioethics Committee, including the woman's principal treating physician, including her psychologist, including her this woman's rights. After those deliberations, a decision had been made, and it's absolutely clear in this record, that a do-not-resuscitate order would not be issued for this woman because it was believed that that was in accord with her often expressed wishes. Dr. Pena was not to understand the reasonable basis for the employment decision that was made by Dr. Bjorndal was his indisputable conduct that occurred on March 3, 2001, when he was the Saturday doctor. He didn't have usual responsibilities for the care of this patient. And we would further submit that there is no evidence in this record that would permit any reasonable inference, that in fact, those were not the reasons at all that he was terminated, but instead the true reasons were that he was being retaliated against for some unrelated speech. Well, he had been complaining about various matters, patient care. He had. As far as Dr. Bjorndal is concerned. He sued somebody else. Yes, that's right. Seemed to be known by other people, even Dr. Bjorndal. The only knowledge that Dr. Bjorndal recalls having that he had been placed in the past on administrative leave before her tenure in the middle of 2000 as medical director. She was completely new to the institution. There are only two pieces of protected activity that there's any knowledge in this record that she even knew about. And there's no evidence in this record that she was opposed to the doctor's speech. Let me move first to the photographic incident, because it's only one of two incidents that the plaintiff is relying on with respect to his photographic speech. We believe that it's crystal clear on this record that no fact finder could regarding photographing patients without their consent and placing those photographs in the medical record, that that was somehow an attempt to suppress the reporting of patient abuse or neglect. First of all, that instruction to Dr. Pena is in the normal course of her duties. She's the medical what the policies of the institution are. Secondly, she did not in any way instruct Dr. Pena not to document instances of suspected abuse or neglect if he thought that was appropriate. She didn't tell him, don't bring them to my attention, don't bring them to the investigative staff's attention, don't bring them outside police attention. She didn't instruct him, don't make detailed notes about what you're doing, about what you're seeing in this patient. And all that she told him was, you can't take photographs without patient's consent and place them in medical records. That seems to be a reasonable instruction. It is a concern that was had any protected activity complaints in the past, but by nursing staff who were upset when they would encounter patient charts and see photographs of these patients in the chart. If a doctor reports patient neglect but doesn't photograph it, isn't there a notation made in the patient record of the doctor's written concerns regarding what he observed? I think that's exactly right. There certainly should be. That would be an alternative way of providing full documentation of whatever conditions were. Other than the potential privacy concerns over what the photograph might show, what's the difference? If we're really talking about... Pardon me. If we're really talking about photographs versus written reports, I'm not sure I see the force of the argument here. I guess there is a policy that says that you can't photograph without consent, and that's it. That was the extent of the discussion, of course. That's the extent of it, Your Honor, and there's no prohibition against taking photographs with the patient's consent. There's no prohibition against getting photographs with the consent of a guardian if that patient is under conservatorship. And presumably the doctor would be free to bring in a nurse or somebody else to look at what he was photographing in order to have a second witness to whatever the injury was. That's correct. Or, of course, the investigative staff or the police staff, if indeed there was a real suspicion that there was a outside abuse going on here, I think the point is that there isn't any reasonable basis upon which one can view that instruction as a cynical attempt to suppress evidence or documentation of patient abuse. And a plaintiff is only entitled to reasonable inferences that can be drawn from the evidence, and under these circumstances that's not a reasonable incident. Let me move to the only other event of protected activity that the plaintiff is pointing to here, and that is the February 21, 2001 memo that he presented Dr. Bjorndal with regarding concerns about a patient's medication regime. Again, that's an activity that one would expect any medical director to come in receipt of. There are no circumstances surrounding this event that even hint of any opposition to that speech by Dr. Bjorndal. She didn't criticize or admonish him in any way for bringing that to her attention. She took appropriate action with respect to that complaint. She forwarded it to the hospital peer review committee, which indeed is exactly the same procedure that Dr. Pena himself had used several years earlier, when he had a different concern about a different patient. And we would suggest that the inference that they're trying to draw from this is almost a facial expression, a totally implausible one. It almost implies that there's criminal intent on behalf of Dr. Bjorndal to think that she would be so upset that someone had, a staff physician, had dared to report to her concerns about a medication that she would then connive and plot to find a completely unrelated and illegitimate excuse to fire him for that. It suggests a state of mind of someone about whom there would be, one would expect, an extraordinary amount of opposition to this kind of activity that doesn't exist at all on this record. Is it really undisputed that for this treatment of the patient, Elizabeth R., what happened there? Is it really undisputed that any doctor, or this doctor in particular, would have been fired, irrespective of the prior concerns about patient compliance? I mean, is it really clear in the record that by not abiding by this ethics plan on the treatment of Elizabeth R., the failure to abide by that would, would result in termination? Is that undisputed? I should think it would be undisputed. I can only point to the undisputed events that occurred on that day, because there are, to my knowledge, and I would hopefully expect that there do not exist any really comparable circumstances. This is really an extraordinary event. It's an act of insubordination, isn't it? It is that as well. And there's no precedent for that? That's never happened before at the Sonoma Developmental Center? Your Honor, I think that the bravamen of the complaint against him was not so much insubordination, although that is a component of it, but it's the deceptive communication. Because let's remind ourselves of what happened, and it's really undisputed. Dr. Bjørndahl gets a phone call at home on a Saturday from Dr. Pena. He says, I've got this patient, she's elderly, she's fragile, she's in decline, I think we should institute a DNR order. That is virtually all he tells her. Well, he does make a reference to an IPP review committee. She says, I don't know what that is, she'd only been there six months at the time, he says nothing further about it. She says, well, do we have her family's input on this? He says, I've tried to contact the sister without success. She says, I'd be more comfortable if you at least got that. That conversation ends. So far, there's no dispute about the substance of that conversation. Not so far in what I've said, I'm trying to restrict my comments to what's undisputed. About an hour later, she then gets a phone call from three people, a program director, the assistant director of nursing, and I forget the title of the third person. And they say, do you realize what's happened here? There's a DNR order who has been written for a patient who we have long understood to be opposed to this order, who has expressed a desire for all measures to be taken to prolong her life. And bioethics committees and interdisciplinary committees have deliberated about this, and they have chosen to do so. They have chosen, in order to honor her wishes, that she have no such order. Dr. Bjorndahl says, this is all news to me. Dr. Pena didn't tell me anything about this. So she immediately places a call back to Dr. Pena, and she says, I was just informed that this patient doesn't want a DNR order, and that there have been deliberations about this in the past, in which to honor her wishes. She's no longer able to speak for herself, that this order should not be in place. He doesn't seem surprised by that information, although he hadn't shared it with her. So she's So why didn't they put an advance directive in the file? Your Honor, in the case of developmentally disabled patients, a written advance directive is a very rare occurrence. It's a legal document that most of these folks Okay, I mean, I know what a living will looks like. But why isn't there some indication in the file that the medical ethics committee, or bioethics committee, or whatever it's called, has reviewed her case and has directed that no aggressive treatment be administered? There certainly was, and I would urge the Court to look carefully at the IPP report, which is at the excerpts of record at 392. And Dr. Pena acknowledges that before he made that first phone call to Dr. Bjorndal, he read this document. He knew what it said. It said two things, both that there had been a prior bioethics committee meeting, and also that although there was some disagreement among the staff as to how much this patient really understood, they concluded the LOC staff discussed what they felt Ms. R's understanding of the process was, and the team agreed that she did understand the choice she had made, and they would honor her request. No DNR request will be made by the team. He knew that information. How did he know that information? Because he acknowledges that he read this report before calling Dr. Bjorndal. I thought there was some question about that. Absolutely not. He read that report and knew, he understood what you just read. He read this report. He knew that these things had happened, and he didn't tell her. In addition to that, he had had a conversation with Dr. Thacker, and Dr. Thacker testified that he told Dr. Pena, well, yes, I'll be the second doctor if policy permits it, but this is a patient who doesn't want this order, and I'm not sure if policy permits it, and you need to check with policy, and you better best call Dr. Bjorndal. Now, it's true that Dr. Pena denies that Dr. Thacker had told him those things, but his... No. Your Honor, it's, if this was a dispute between Dr. Pena and Dr. Thacker, it might be, but this... No, it goes to Dr. Pena's state of mind. No, it goes to Dr. Bjorndal's state of mind, because Dr. Bjorndal... But Dr. Bjorndal's state of mind has to be informed by the veracity of what Dr. Pena told her. So isn't evidence of what Dr. Pena truthfully believed relevant to determine Dr. Bjorndal's state of mind? I think that what's relevant to Dr. Bjorndal's state of mind is that, number one, she knew, and this is undisputed, that Dr. Pena didn't tell her that this patient was someone who didn't want a DNR order, and that her other trusted staff physician, Dr. Thacker, had told him that she had these wishes, and that conversation... He says that didn't happen, that Thacker didn't say that to him, right? Yes. Why isn't that a material issue, a fact that's in dispute that only a jury can resolve? Well, if there was some evidence in this record that suggested that Dr. Bjorndal knew that Dr. Thacker's statement was untrue and unreliable, then perhaps it would, but there is no such evidence. No, the issue is whether or not we can accept your representation that whatever it was that Dr. Pena said to Dr. Thacker, Dr. Bjorndal, he knew to be untrue. Otherwise, the whole thing may be just a miscommunication. Your Honor, Dr. Bjorndal had the right not just to rely on her own knowledge of the conversation she'd had with Dr. Pena, but also to rely on the investigation report that she received. And I would really urge the Court to look carefully at that investigation report. Your way, we've engaged you all over your time. I appreciate the indulgence, Your Honor. Thank you very much. Thank you. I do apologize for my phone going off. It shouldn't have happened. Very quickly, Your Honor, you asked would any doctor be fired for this offense. If you look at the record. We do dispute that. And I'd like to respond to that, which is we do dispute that, and in the record there's evidence that other doctors were treated differently, and that's in Record Excerpt 390 and 391. There's a patient, George, in which a DNR order is written with the concurrence of two doctors from SDC when the individual is at another hospital without following proper procedure, the bioethics, the action called for there was not termination, but that a memo be sent to them having them clarify what the policy was about. That would have been an appropriate thing to do here. But did that involve an accusation that either of the doctors had essentially engaged in misrepresentation of the circumstances? Not that I'm aware of, but in this case all of them. Wouldn't that be a distinguishing factor then? In other words, that's not really an applicable precedent because it involved misleading? The DNR without appropriate procedure is the basis. My client's been treated differently than these other two doctors, to the degree that they say it's not because he issued the DNR without following proper procedures, but because he misrepresented things to Dr. Bjorndal. In the record here, each of the incidents that they say he misrepresented something to her, he has disputed with evidence. For instance, they say he failed to tell her that the client's right advocate told him that she wanted CPR. The record shows that the client rights advocate did not talk to Dr. Pena until after he had talked to Dr. Bjorndal twice, that it was in the third conversation that she then told him, I've heard from the client's rights advocate. So we dispute that misrepresentation. The Dr. Thacker representation, that's already been discussed in his deposition, he disputes that. In terms of not telling her about these prior meetings, his testimony is that on the day he called, the very first conversation he had with Dr. Bjorndal, he told her there was an IPP meeting in which the DNR was addressed. They did not issue one at that time, but the circumstances are dramatically different now. At this point, administering CPR will serve her no benefit and will cause her pain. And that's what all the doctors say about that point. The notion that counsel put out that my client disobeyed the course of action that the institution had decided upon falls on several grounds. Institutions don't decide on treatment of patients. Doctors do. In the immediate situation, they have to exercise their own independent judgment. Secondly, as Dr. Gatham, the chairman of the Ethics Committee, said, we don't look forward to the situation. We're talking about the situation as it is at the time we're reviewing it. At the time his committee reviewed it in November, her condition wasn't serious enough that something else might not have stopped her heart other than the kidney failure, and therefore CPR would be appropriate. Similarly, in January, she still hadn't reached the end stages of the final disease that Dr. Gatham said would be appropriate. He says once they reach that stage, a DNR is appropriate because CPR will do them no good. I realize that when a patient has reached end stage renal disease, they're probably not competent to make the decision. But assuming that they were, what is the state of the record with regard to a patient who insists upon an advanced directive notwithstanding their condition, even if they're in a coma? This is dealt with by the experts that are part of this record that reviewed this situation. The point they make is if a patient comes to a doctor and says, I want my arm cut off, if having their arm cut off causes them pain and harm and does them no medical benefit, the doctor does not have to cut their arm off. Similarly, the ethics specialist, and it's in the record here, although it's not cited in my brief, the specific page, but if you look at what the doctor says, what he says, he says at the point at which CPR will offer no benefit to a patient, it shouldn't be offered to a patient. Because you're asking a doctor to do something that's against his basic oath, which is do no harm. So if you're doing a medical procedure that's going to risk harm and give her no benefit, even if she wants it, you're not required to give it to her. Thank you, counsel. Thank you. Appreciate the arguments.
judges: Paez, Tallman, Karlton